

FILED

May 15 2023, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Joshua Vincent
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Sean T. Dewey
Alexandria H. Pittman
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Civil Commitment of : <br><br> J.G., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Community Health Network, Inc., <br> *Appellee-Petitioner.* | May 15, 2023 <br><br> Court of Appeals Case No. <br> 22A-MH-2533 <br><br> Appeal from the Marion Superior Court Probate Division <br><br> The Honorable Steven Eichholtz, Judge <br><br> The Honorable Ranissa Dycus, Judge Pro Tempore <br><br> Trial Court Cause No. <br> 49D08-2210-MH-34683 |

**Opinion by Judge Bailey**
Judges Brown and Weissmann concur.

**Bailey, Judge.**

# Case Summary

[1] J.G. appeals an involuntary, temporary commitment order that expired on January 10, 2023, contending that it was not supported by sufficient evidence. Because her appeal is moot and does not fall within an exception to the mootness doctrine, we dismiss the appeal.

# Facts and Procedural History

[2] J.G. is a stay-at-home mom who was forty-three years old at the time of the commitment hearing on October 12, 2022. J.G. lived in Lafayette with her husband, D.G. ("Husband"), and their two minor children. J.G. had a fifteen-year history of mental illness, namely, bipolar disorder. J.G.'s first documented manic episode occurred in 2008, and she was treated by Dr. Jason Ehret at Community Hospital. Between 2008 and 2010, J.G. was hospitalized twice for mental health issues.

[3] On August 22, 2022, J.G.'s six-year-old daughter underwent a lengthy surgery, which was a "very stressful" time for J.G. and Husband. Tr. at 12. At that time, J.G. asked Husband to contact J.G.'s psychiatrist because J.G. "was in a crisis." *Id.* Thereafter, J.G.'s mental condition deteriorated, necessitating multiple 9-1-1 calls, increased levels of psychiatric intervention, and hospitalization. J.G.'s "communication changed, … she was struggling to sleep …, [and her] decision making … was erratic." *Id.* at 14. J.G. began to "mak[e] purchases that she normally wouldn't make." *Id.*

[4]     One morning in September, at about 4:30 a.m., J.G. was in the shower and began "pounding on the shower walls," waking Husband up. When Husband checked on J.G., she began screaming and "cuss[ing]." *Id*. at 15. J.G. told Husband that "people were coming to help her," including "Trent Reznor[]," a musician who was "out in the front yard." *Id*. J.G. also told Husband that a plane was flying over the house and that it was "likely her cousin [who lives in California] coming to help her." *Id*. No one was outside the home at that time. The children were awakened by this incident and locked their bedroom door while it was going on. Husband called 9-1-1, and J.G. was taken to the emergency room.

[5]     During another incident in early September, Husband returned home to find J.G. "getting stuff out of [their] garage and scattering it all over both [their] front and back yards." *Id*. at 18. J.G. was "loud and cussing and irate again." *Id*. Husband called 9-1-1, and J.G. was ultimately admitted to the local psychiatric hospital for about four days.

[6]     In another incident in late September, J.G. "ha[d] an incredible amount of energy and [was] going many different direction[s]." *Id*. at 20. J.G. decided that she needed to visit her father, who lives in a place in southern Illinois that is a forty-minute drive west of Vincennes. The next morning, J.G. told Husband that she "d[id] not believe she need[ed] to take her meds anymore" and that she had bought an inflatable kayak and planned "to kayak from Lafayette to Vincennes" to visit her father. *Id*. at 21. J.G. wanted to take her six-year-old daughter in the kayak with her, but Husband refused to allow it.

[7]     J.G. eventually abandoned her plan to kayak to Illinois, but she then began talking to Husband about a retreat with her college friends. J.G. had also texted a friend, K.T., telling her that some friends were going to pick her up and "go retreating into the night." *Id*. at 35. After the children went to bed on October 2, 2022, until approximately 11:00 p.m., J.G. filled the back patio with "twenty [to] twenty-five packs full of stuff, suitcases full of clothes, coolers full of food." *Id*. at 22-23. From the living room couch, Husband attempted to watch J.G. outside in the backyard, but he eventually fell asleep.

[8]     When Husband awoke at approximately 2:00 a.m. on October 3, he saw that J.G. had moved everything from their back patio to the front yard. J.G. had pulled up all of their flowers and scattered them around, and "the landscaping in [the] neighbor's yard was thrown around" as well. *Id*. at 23. J.G. had "laid [blankets] out in the front yard," "scattered [yard lights and glow sticks] down the street," and "had taken … [a] three-gallon cooler filled with lemonade [and] put it on a car two houses down." *Id*. When Husband asked why she had done this, J.G. told him there was going to be a circus at the local junior high school, and that she had set everything up so "[t]he neighborhood kids and [her] kids could come and watch the parade." *Id*. However, there was no circus or parade. Husband eventually lost track of J.G., so he called the police who said they would search the neighborhood and contact him if they found her.

[9]     Meanwhile, J.G. had gone to a Taco Bell restaurant at around "three or four" that morning to "hide out in the bathroom because [she] saw the flashlights around [her] neighborhood." *Id*. at 61-62. She remained at the Taco Bell until

it closed and then she "had to go out and face the cops." *Id.* at 62. J.G. admitted that she had "toilet paper[ed]" the toilet in the Taco Bell bathroom, which led to police involvement and another brief admittance to the hospital. *Id.* at 61.

[10] J.G. was discharged from the hospital after only a few hours. When she was dropped off at home, she ran down the street. Husband sent a text message to K.T. asking her to look for J.G. because Husband could not leave the children at home alone to look for J.G. himself. K.T. found J.G. "walking from house to house" in J.G.'s neighborhood, "yelling at houses," with her clothes "turned wrong side out." *Id.* at 36. J.G. had "blue vomit bags from the emergency room" on her feet, and she was wearing them "like socks" with her "shoes on over [them]." *Id.* J.G. got in K.T.'s vehicle upon request, and K.T. took J.G. back to J.G.'s home. J.G. then stood in the backyard "screaming at the trees and the sky." *Id.* at 38. K.T., in consultation with Husband, decided to bring J.G. to Community East because they believed that J.G. could receive better care in Indianapolis.

[11] K.T. drove J.G. to the hospital and characterized J.G.'s state at that time as being "like a complete psychotic break." *Id.* During the approximately one hour and fifteen-minute drive to Community East, J.G. was delusional and in the throes of a manic episode, "speaking loudly and rapidly," and her thoughts "were trailing one direction to another." *Id.* at 39. J.G. "saw ghosts in the trees," was talking to people on "some imaginary server" through a headset that was not "plugged in to anything," and "mentioned being a magical fairy." *Id.*

at 40. She then started "talking about Mitch Daniel's [sic] daughter and tiny houses which launched into a conversation about her cousin not [being] willing to take her out on a kayak." *Id*. J.G. verbalized "streams of thoughts," had an unusual speech pattern, and "was on tangents all over the place, none of it was cohesive." *Id*.

[12] Upon her admission to Community Hospital, J.G. was examined, diagnosed with "Bipolar Disorder Type I, current episode manic," and given medications for her manic behavior. *Id*. at 48. Dr. Ehret, who had treated J.G in 2008 for the same condition and diagnosis, saw J.G. almost every day from October 4 through 12, and the last time he had examined her was the morning of the October 12 hearing. As support for his diagnosis, Dr. Ehret noted J.G.'s prior history of Bipolar Disorder and further explained that J.G. presented to the hospital in a manic state and displayed classic manic symptoms of "elevated self-worth, grandiose thoughts, decreased sleep, increased … pressure in speech, racing thoughts … [and increased] goal directed activities." *Id*. at 46-48. J.G. had "limited insight" regarding her condition which "affect[ed] her ability to seek care [and] take medications," and she cannot "be relied upon to take her medications without supervision." *Id*. at 49-50.

[13] At the time of the hearing, Dr. Ehret believed J.G. was "gravely disabled" as a result of her mental illness. *Id*. at 50. In Dr. Ehret's opinion, the events that led to J.G.'s most recent hospitalization—i.e., planning a lengthy kayak trip with her six-year-old child, tearing up landscaping to prepare for the non-existent parade, and toilet papering a Taco Bell bathroom—were examples of her

behaviors that exhibited poor judgment and reasoning. In Dr. Ehret's opinion, a temporary commitment was the least restrictive means available to bring about an improvement in J.G.'s condition, and he believed that, without treatment through a commitment, J.G. would quickly return to a state of mania.

[14] J.G. also testified at the hearing. She stated that she did not agree with Dr. Ehret's testimony. She asserted that the proposed kayak trip to Illinois was "safe" as she was "pretty much an expert" in water sports. *Id*. at 59. She stated that her intent to take her six-year-old daughter with her on the kayak trip to Illinois was "a half joke, maybe somewhat sort of serious but not really." *Id*. at 60. She noted that she "fe[lt] safer having her [daughter] with [herself] than leaving her with [Husband] because he just falls asleep on the couch" while their daughter is awake. *Id*. J.G. admitted to "toilet papering a Taco Bell," but stated that "[i]t was something that could be cleaned up in two minutes" and that she did not "deface" or "sh-t on" or "p-ss on anything." *Id*. at 62. Regarding her statements that she was going on a retreat with friends, J.G. characterized her statements as meaning she could go to "mental health facilities out there that are called retreats that can be on my own terms and my timeline." *Id*. at 63.

[15] When asked whether she agreed with her diagnosis of Bipolar Disorder Type I, J.G. stated, "I guess,… yeah, I'll go ahead and accept the diagnosis." *Id*. But she stated that "every time [she] had a hospitalization it's a pattern of [H]usband not showing up and being there and picking up the slack for when

[she] ha[s] stress in [her] life" or her "mother comes and triggers" her. *Id.* at 64. J.G. stated that she "always take[s her] medications as prescribed," although she admitted she had not taken them during "all these episodes their [sic] complaining about." *Id.* at 65. J.G. concluded that she "was never a harm to [her]self or others, other people's perceptions are skewed very far from reality and some people like [her] husband do need some mental and psychological help themselves, but they are refusing to get it." *Id.* at 67. J.G. stated that "label[s]" such as "Bipolar manic" are "mean and unnecessary, perhaps instead ask what [she is] trying to communicate and what unmet needs are in [her] heart or what unmet needs should be met that should be easy to meet." *Id.* at 68.

[16] In an order dated October 13, 2022, the trial court granted Community Health Network's ("CHN") request for a temporary commitment "until January 10, 2023, unless discharged prior." App. at 12. The court found, among other things, that CHN had proven "by clear and convincing evidence" that J.G. was suffering from Bipolar Disorder I, manic type, which was a mental illness; that J.G. was gravely disabled; and that J.G. was "in need of custody, care, and treatment at CHN for a period of time not expected to exceed ninety (90) days." *Id.* at 11. The trial court granted CHN an "Order to Treat" that would expire with the commitment. *Id.* at 12. This appeal ensued.

## Discussion and Decision

[17]   J.G. appeals a temporary commitment that expired on January 10, 2023; thus, CHN asserts that her appeal should be dismissed as moot. "A case is moot when the controversy at issue has been ended, settled, or otherwise disposed of so that the court can give the parties no effective relief." *E.F. v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022). However, under Indiana common law, the appellate courts have discretion to decide moot cases that present issues of great public importance that are likely to recur. *Id*. In the context of temporary mental health commitments, this Court "routinely consider[s] the merits" of moot cases where the appeal addresses a novel issue, presents a "close case," or presents an opportunity to develop case law on a complicated topic. *Id*. at 467. We do so because a "[c]ivil commitment for any purpose has a very significant impact on the individual and constitutes a significant deprivation of liberty that requires due process protection." *Id*. (quotations and citation omitted). However, "because one of the hallmarks of a moot case is the court's inability to provide effective relief, appellate courts are not required to issue an opinion in every moot case." *Id*. (citations omitted). Rather, we apply the mootness exception "on a case-by-case basis." *Id*. at 465.

[18]   Here, J.G.'s appeal does not address a novel issue or present an opportunity to develop case law on a complicated topic. *Cf., e.g.*, *T.W. v. St. Vincent Hosp. and Health Ctr., Inc.*, 121 N.E.3d 1039, 1042 (Ind. 2019) (choosing to address a moot temporary commitment because the appeal involved the important public question of the probate commissioner's authority to enter civil commitment orders). However, J.G. asserts that this appeal should be decided on the merits

because it involves a "close case." *E.F.*, 188 N.E.3d at 467 (citing *M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005), *trans. denied*).

[19] We disagree that this is a close case, given the ample, clear and convincing evidence that J.G. has a "substantial impairment or an obvious deterioration of [her] judgment," i.e., Bipolar Disorder Type I, which poses a danger of J.G. coming to harm because it impairs her "ability to function independently." I.C. § 12-7-2-96(2). Dr. Ehret testified that, at the time of the hearing, J.G. had Bipolar Disorder Type I with "current episode manic," which caused her to exhibit poor "judgment, reasoning, or behavior." Tr. at 48, 49. There were multiple examples of such poor judgment, reasoning, and behavior that affected J.G.'s ability to function independently in the two months preceding her commitment. Dr. Ehret further testified that J.G. had "limited insight" into her mental illness which negatively affected her ability to seek care and take necessary medications without supervision. *Id*. at 49. Dr. Ehret stated that, without a temporary commitment that could provide a "controlled environment … with limited stimulation," *id*. at 55, J.G. was likely to "quickly return to a state of mania," *id*. at 52.

[20] J.G. has failed to show that this is a "close case" such that the mootness doctrine should not be applied.

# Conclusion

[21] J.G.'s appeal is moot, as her temporary commitment has expired and she has failed to show an applicable exception to the mootness doctrine.

[22] Dismissed.

Brown, J., and Weissmann, J., concur.